UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

RUFUS WEST,

           Plaintiff,

      v.                                              Case No. 20-cv-282-bhl

WILLIAM SWIEKATOWSKI, et al.,

           Defendants.

---

## DECISION AND ORDER

---

      Plaintiff Rufus West, who is representing himself, is proceeding on a Fourteenth Amendment claim that Defendants William Swiekatowski, Ryan Baumann, Scott Eckstein, and Cindy O'Donnell violated his due process rights in their handling of a January 9, 2017 conduct report. Dkt. No. 13. On September 1, 2021, Defendants filed a motion for summary judgment, which is now fully briefed and ready for resolution. Dkt. Nos. 21-22, 31, & 34. Because the undisputed facts show West was not denied a protected "liberty interest," he cannot show a due process violation, and the Court will grant Defendants' motion and dismiss the case.

### UNDISPUTED FACTS

**I.    The Parties**

      West was an inmate at the Green Bay Correctional Institution in late 2016 and early 2017. Dkt. No. 23, ¶1. Defendants William Swiekatowski and Ryan Baumann were correctional officers; defendant Scott Eckstein was the warden; and defendant Cindy O'Donnell served as the "designee" of the Office of the Secretary of the Department of Corrections. *Id.*, ¶¶2-5.

## II. West's Conduct Report

On January 9, 2017, Captain Stevens (not a defendant) gave West a conduct report for alleged violations of DOC §303.28 (Disobeying Orders) and DOC §303.3 (Lying). Dkt. No. 23, ¶¶22-23; *see also* Dkt. No. 24-1 at 4. According to the conduct report, West and inmate Darin Cobb addressed a group of inmates in Chapel and told them that either West or Cobb would be giving the Khutbah for Islamic Jumah services from that point on. Dkt. No. 23, ¶22. Cobb allegedly stated, "they were there for Jumah" and "it didn't matter if they were 2-4, 7-4, or 22-12." *Id*. These numbers allegedly represented prison gangs—2-4 represented the Black Disciples, 7-4 represented the Gangster Disciples, and 22-12 represented the Vice Lords. *Id*., ¶23.

Prison rules prohibit inmates from leading religious services for security reasons. *Id*., ¶¶24, 39-43. Further, the Chapel is a unique location in the institution where inmates who are purposefully separated in other areas of the institution due to gang activity can congregate together for a religious service. *Id*., ¶27. Because West allegedly stated he would be leading religious services going forward, and specific gangs were allegedly referenced through code, he was reported for Disobeying Orders and Lying. *Id*., ¶28.

On January 11, 2017, Baumann reviewed the conduct report and determined that it should proceed as a "major" offense because of the overall risk of disruption caused by mentioning several different gangs, all of whom were congregated in the Chapel together. *Id*., ¶¶25-29. Two days later, on January 13, 2017, West received a form allowing him to request witnesses for his conduct report hearing. *Id*., ¶33. West completed the form and requested two witnesses: (1) Officer Frappier, who was the only correctional officer present in the Chapel for the incident; and (2) inmate Agustin Velez who was also present. Dkt. No. 24-1 at 9. West took too long to return the

2

form (three days rather than the required two days), so Swiekatowski denied his request for witnesses as untimely. Dkt. No. 23, ¶¶35, 50.

### III. West's Conduct Report Hearing and Subsequent Appeals

On January 19, 2017, Swiekatowski held a due process hearing on the conduct report. Dkt. No. 23, ¶¶30-36. West appeared and provided a written statement asserting that the report's allegations were all "lies." Dkt. No. 24-1 at 10-11. He also noted that none of the staff present during the incident (Officer Frappier, Chaplin Donnovan, and religious volunteer Mazin) wrote him a conduct report or were asked to participate in the hearing. *Id*. Based on written statements from West and his staff representative, the conduct report itself, and a separate document concluding that West's conduct was related to gang activity, Swiekatowski found West guilty of Disobeying Orders and Lying and recommended 120 days disciplinary separation. Dkt. No. 23, ¶¶36-45.

West then initiated a series of appeals under both DOC ch. 303 (the prison's disciplinary procedures) and DOC ch. 310 (the Inmate Complaint Review System). Dkt. No. 23, ¶¶45-73. Under DOC ch. 303, West appealed the conduct report to Eckstein, who reviewed the conduct report, all of the hearing documents, all of the appeal documents, and found they supported a finding of guilt. *Id*., ¶¶46-52. Eckstein was the final decision maker under ch. 303. *Id*.

Under DOC ch. 310, West filed two inmate complaints challenging the procedures used for the conduct report and due process hearing. *Id*., ¶¶54-73. The Institute Complaint Examiner (ICE) rejected West's first inmate complaint as premature because the conduct report hearing had not yet occurred. *Id*., ¶¶54-57. The ICE recommended dismissing West's second inmate complaint because he found no procedural errors. *Id*., ¶¶62-66. Eckstein, functioning as the "Reviewing Authority" this time, reviewed the ICE recommendation, agreed there were no

3

procedural errors, and dismissed West's second inmate complaint on March 21, 2017. *Id*., ¶¶66-68. West appealed to the Corrections Complaint Examiner (CCE), who recommended dismissing the appeal because West had not properly appealed each procedural issue at each level of appeal. *Id*., ¶69. O'Donnell "accepted" CCE's recommendation and dismissed the appeal on April 19, 2017. *Id*., ¶¶70-73. O'Donnell was the final decision maker under ch. 310. *Id*.

West then filed a petition for *writ of certiorari* in Wisconsin state court seeking review of the conduct report, due process hearing, and his appeals. Dkt. No. 33, ¶54. On May 4, 2018, a state court judge concluded that West should have been able to present his witnesses and ordered a new due process hearing. *Id*. West received a new due process hearing and the charges in the conduct report were later dismissed. *Id*., ¶55.

### IV. West's Placement In "The Hole"

West states he was in "the hole" from January 2017 to March 2017 as a result of the conduct report and due process hearing. Dkt. No. 33, ¶53. According to West, the hole "is any place where the prisoner is placed when he is locked up away from the general population." Dkt. No. 32, ¶13. West explains that he was imprisoned in "freezing cells." Dkt. No. 33, ¶53. He states, "[t]he air from the vent was blowing ice-cold like an air conditioner in the summer." *Id*.

According to Defendants, on January 3, 2017, West moved from general population to Treatment Center cell 319 pending an investigation into the Chapel incident. Dkt. No. 23, ¶8. On January 19, 2017, West moved from Treatment Center cell 319 to Restricted Housing Unit (RHU) cell 516. *Id*., ¶9. On February 20, 2017, West moved back to Treatment Center cell 306. *Id.,* ¶10. On March 7, 2017, West was released back into general population. *Id*., ¶11. In sum, the parties agree that West served at most a total of 63-days in "the hole" out of the 120 day disposition. *Id*., ¶12; *see also* Dkt. No. 32, ¶12.

4

Defendants explain that cells in the Treatment Center and RHU are not temperature controlled individually. Dkt. No. 23, ¶¶13, 18. Thus, a malfunctioning thermostat in either area would result in multiple cells with below normal temperatures, not just one cell. *Id*., ¶¶15, 18-19. The temperature in the Treatment Center is controlled by thermostats housed in each wing. *Id*., ¶19. If a thermostat was not working, the entire wing would be cold (or hot). *Id.* Similarly, the temperature in the RHU is controlled by Air Handling Units (specifically, AHU #5), which provide centralized air to specific areas of that building. *Id*., ¶13. Again, if the thermostat is not working, every cell attached to AHU #5 would be affected. *Id*. Defendants note that the temperature is set between 68-72 degrees depending on the time of year. *Id.*

West did not file any inmate complaints between January 3, 2017 and March 7, 2017 alleging that his cell was cold.[1] *Id*., ¶21. Further, no other inmates (or staff) complained about below-normal temperatures during the time West was housed in the Treatment Center or RHU. *Id*., ¶¶16-20. There is no record of any work orders, calls to maintenance staff, staff complaints, or widespread inmate complaints in either unit between January 3, 2017 and March 7, 2017. *Id.*

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if

---

[1] West purports to "dispute[] that he did not complain about his cell being too cold." *See* Dkt. No. 32, ¶21. But West does not offer any support for this contention. He does not attach any inmate complaints establishing that he complained about the temperature in this cell or offer other evidentiary support. West merely cites to "page 21" of his Declaration, but his Declaration is only one page and neither that declaration nor documents attached to it appear to mention (on page 21 or otherwise) any complaints about the temperature in his cell. *See* Dkt. No. 33 and 33-1.

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The party asserting that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

Defendants assert they are entitled to summary judgment on several grounds. First, they insist West failed to exhaust his administrative remedies. Second, they argue, and even if he had exhausted, he has not shown that he was deprived of a "liberty" interest. Dkt. No. 22 at 3-15. Third, Defendants also contend that, contrary to the state court judge's decision in his petition for *writ of certiorari*, West received adequate due process during his conduct report hearing. *Id*. at 15-19. The Court will not address Defendants' first argument because they waived any challenges to West's failure to exhaust by not raising that argument timely under the Court's scheduling order. The Court agrees with Defendants' second argument, however, West has not marshaled sufficient evidence to show he was deprived of a "liberty" interest. Accordingly, his claims will be dismissed on the merits. Given this ruling, the Court need not address Defendants' final argument, inviting the second-guessing of the state court's ruling.

## I. Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones v. Bock*, 549 U.S. 199, 204 (2007). "This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." *Id*.

The Seventh Circuit has consistently held that issues related to exhaustion should be resolved at the outset of the case. *See Pavey v. Conley,* 544 F.3d 739, 742 (7th Cir. 2008); *see also Wagoner v. Lemmon,* 778 F.3d 586, 593 (7th Cir. 2015). "If merits discovery is allowed to begin before [the resolution of the issue of exhaustion], the statutory goal of sparing federal courts the burden of prisoner litigation until and unless the prisoner has exhausted his administrative remedies will not be achieved." *Pavey,* 544 F.3d at 742. Failure to timely raise exhaustion before a court-ordered deadline can result in waiver or forfeiture of the argument. *Harris v. Cnty. of Cook*, No. 19-CV-4598, 2022 WL 425716, at *6-7 (N.D. Ill. Feb. 11, 2022) (citing *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999)). Forfeiture occurs when a party fails to make an argument because of "accident or neglect" whereas waiver "is a deliberate decision not to present a ground for relief that might be available in the law." *Id*. at *7 (citing *Ricci v. Salzman*, 976 F.3d 768, 771 n.2 (7th Cir. 2020)).

The Court set a specific deadline (April 1, 2021) for Defendants to move for summary judgment based on West's alleged failure to exhaust administrative remedies. Dkt. No. 18.

7

Defendants did not meet that deadline. Ignoring this failure, they now seek to raise the issue in their summary judgment merits motion. They seek to justify their disregard for the scheduling order by pointing to instances when other district courts have allowed summary judgment arguments based on exhaustion to be raised at the same time as summary judgment arguments on the merits. Dkt. No. 22 at 10. Defendants explain that they "evaluated the [exhaustion] defense at the time [of the April 1 deadline] and believed the inmate complaint [identifying due process violations]…was sufficient for exhaustion." *Id*. at 9-10. They claim only later to have learned of a case that requires inmates to identify the specific "liberty" interest at stake to properly exhaust on a Fourteenth Amendment due process claim. *Id*. at 10. They seize upon this late-discovered caselaw to argue that because West's inmate complaint never discussed the cold conditions of confinement, he failed to identify a protected liberty interest and therefor also failed to exhaust his administrative remedies. *Id*.

Defendants' excuse is unavailing. As an initial matter, they are not relying on *new* caselaw that was unavailable to them when they decided not to timely pursue summary judgment on exhaustion grounds. Rather, they ask to be excused from complying with the scheduling order because they only recently learned of a case decided *more than 15 years ago*. *Id*. Tardy research is not a basis for Defendants' failure to comply with the Court's scheduling order.

This Court has the authority to set and enforce its own deadlines and thus could excuse Defendants' failure. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 605 (7th Cir. 2006) ("Rule 6(b)…clearly gives courts both the authority to establish deadlines and the discretion to enforce them."). But imposing a deadline to file a motion for summary judgment based on failure to exhaust administrative remedies is common practice in this circuit. This bifurcated summary judgment approach is intended to further the PLRA's statutory goal of sparing courts the burden

8

of prisoner litigation at the outset of the case in instances where exhaustion is not satisfied. *See e.g. Smalls v. McAllister*, No. 19-CV-679-JDP, 2021 WL 5758879, at *4 (W.D. Wis. Dec. 3, 2021); *see e.g. Al Momani v. Butler,* No. 3:17-CV-01034 -MAB, 2020 WL 5822047, at *5 (S.D. Ill. Sept. 30, 2020). Defendants' explanation amounts to a "deliberate decision not to present a ground for relief that might be available in the law." This means Defendants waived the argument. The Court will therefore resolve this case on the merits.

## II. Fourteenth Amendment Due Process

To establish a Fourteenth Amendment due process claim, West must provide evidence from which a reasonable jury could conclude that: (1) his placement in disciplinary segregation triggered a "liberty" interest; and (2) defendants used procedures during the disciplinary proceeding that were constitutionally deficient. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (citing *Rowe v. DeBruyn*, 17 F.3d 1047, 1053 (7th Cir. 1994)). The Court looks to what process was "due" only if a liberty interest is triggered. *See Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974).

A prisoner's liberty interest "extends only to freedom from deprivations that 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Lekas v. Briley*, 405 F.3d 602, 608 (7th Cir. 2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995)). A prisoner's liberty interest in avoiding disciplinary segregation is limited because prison officials have significant latitude to punish prisoners for their misconduct. *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (citing *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009)). Generally, "six months of segregation is not such an extreme term and, standing alone, would not trigger due process rights." *Marion,* 559 F.3d at 698 (quoting *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995)). But a stay in segregation less than six months can

9

trigger due process rights if an inmate faces "exceptionally harsh conditions." *Hardaway,* 734 F.3d at 743; *see also Singh v. Gegare*, 651 F. App'x 551, 555 (7th Cir. 2016) (quoting *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015)) ("A relatively brief stint in punitive segregation might arguably constitute a deprivation of liberty 'depending on the conditions of confinement' and whether 'additional punishments' also were imposed."). The Court looks to "the combined import of the duration of the segregative confinement *and* the conditions endured." *Hardaway,* 734 at 743-44 (citing *Marion*, 559 F.3d at 697 (emphasis in original)). Examples of exceptionally harsh conditions include deprivation of "all human contact or sensory stimuli," which can cause adverse psychological effect. *Id*. at 744.

Based on the record, no reasonable jury could conclude that West was deprived of a liberty interest. As an initial matter, it is undisputed that West was in "the hole" for at most 63 days in total. Dkt. No. 32, ¶12. This is well short of the six months threshold usually needed to trigger a liberty interest. *See Hoskins v. Lenear*, 395 F.3d 372, 374-75 (7th Cir. 2005) (concluding that a prisoner was not entitled to due process for discipline of two months in segregation, the loss of prison job, the loss of privileges, and a transfer); *see also Townsend v. Fuchs*, 522 F.3d 765, 722 (7th Cir. 2008) (concluding that a prisoner had not established a liberty interest where he was placed in lock-up with a wet, moldy mattress for 59 days pending an investigation into a prison riot).

Further, Defendants have provided ample evidence that the temperature in West's cell did not rise to the level of being "exceptionally harsh." The record establishes that the institution's temperature is typically set between 68-72 degrees and that the temperature in West's cell was controlled by systems that made it the same as other areas. Yet no staff or other inmates who were in that area of the building reported any temperature change, let alone an exceptionally harsh one.

10

There were no work orders, calls to maintenance staff, staff complaints, or widespread inmate complaints in either of the units where West was housed. West himself also did not complain about the cold conditions in his cell at the time.

West's attempt to rebut Defendants' evidence, using a vague two-sentence assertion that his cell was "freezing" and it felt like "[t]he air from the vent was blowing ice-cold like an air conditioner in the summer," falls short of creating a genuine dispute of material fact on his having had to endure exceptionally harsh conditions. Indeed, his vague assertions lack sufficient detail to support a finding that the temperature in his cell was so "harsh" or "atypical" from ordinary prison life that it gave rise to constitutional due process concerns. *See e.g. Lisle v. Welborn*, 933 F.3d 705, 721 (7th Cir. 2019) (noting that "vague descriptions of [a] cell" were not enough to show an atypical and significant hardship.) At best, West's assertions might support a finding that his cell was uncomfortable. But, as a matter of law, that is not enough for a reasonable jury to conclude that he endured conditions so "harsh" and "atypical" that due process might have been offended. *See e.g. Nichols v. Best*, No. 15 C 2946, 2017 WL 3872488, at *5 (N.D. Ill. Sept. 5, 2017) (concluding that a prisoner's placement in a cell with a broken window for 24 days between the months of December and February "was likely uncomfortable and may even implicate the Eighth Amendment [but] was not sufficiently harsh or atypical from ordinary prison life to give rise to constitutional due process concerns."); *Pasley v. Crammer*, No. 17-CV-1085-JPG, 2018 WL 1836968, at *3 (S.D. Ill. Apr. 18, 2018) ("Plaintiff's assertion that cold air blows on him is also too thin to support a claim."). Defendants are therefore entitled to summary judgment and the Court will dismiss this case.

## CONCLUSION

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (Dkt. No. 21) is **GRANTED** and this case is **DISMISSED**. The Clerk's

11

office shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin on August 4, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.